IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JOSHUA THOMAS WALKER,

      Plaintiff,

                                 Civil Action 2:15-cv-558
   v.                         Chief Judge Edmund A. Sargus, Jr.
                                 Magistrate Judge Elizabeth P. Deavers

COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

## REPORT AND RECOMMENDATION

      Plaintiff, Joshua Thomas Walker, brings this action under 42 U.S.C. §§ 405(g) and

1383(c)(3) for review of a final decision of the Commissioner of Social Security

("Commissioner") denying his applications for social security disability insurance benefits and

supplemental security income.  This matter is before the United States Magistrate Judge for a

Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 13), the

Commissioner's Memorandum in Opposition (ECF No. 18), Plaintiff's Reply (ECF No. 19), and

the administrative record (ECF No. 10).  For the reasons that follow, it is **RECOMMENDED**

that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's

decision.

## I.   BACKGROUND

      Plaintiff filed his applications for benefits on September 16, 2011, alleging that he has

been disabled since May 26, 2011, due to back problems, diabetes, and manic depression.  (R. at

215-16, 217-24, 235.)  Plaintiff's applications were denied initially and upon reconsideration.

Plaintiff sought a *de novo* hearing before an administrative law judge.  Administrative Law Judge Paul E. Yerian ("ALJ") held a hearing on May 15, 2013, at which Plaintiff, represented by counsel, appeared and testified.  (R. at 45-67.)  George W. Coleman, III, a vocational expert, also appeared and testified at the hearing.  (R. at 67–76.)  On June 26, 2013, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 23-33.)  On August 29, 2014, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  (R. at 5-10.)  Plaintiff then timely commenced the instant action.

## II.   HEARING TESTIMONY

### A.     Plaintiff's Testimony

Plaintiff testified at the administrative hearing that he lives in a trailer with two friends.  (R. at 46.)  He has a driver's license and drives about four times per week for about ten minutes at a time.  (*Id.*)  He did drive to the hearing, which was fifty miles from his house.  (R. at 46-47.)  Plaintiff testified that he attended Tri-County Career Center from September 2012 until the end of April 2013, but that he did not return to school because he was told by the school that his grades were too low to continue.  (R. at 47-48.)  He added that he did okay the first quarter, but computer classes and a bad instructor caused him to do poorly in the second quarter.  He indicated that when he was in school, it was four days per week from 8:00 a.m. until 4:30 p.m.  Plaintiff said he would often leave school early due to the anxiety he experienced being around his classmates.

Plaintiff testified that since filing the application in September 2011, he applied for jobs at a tractor supply store and at fast food places, but that he had not received any job offers.  (R. at

2

50-51.)  He indicated that he currently cooks food for an elderly friend of the family.  He indicated that he cannot currently work due to his anxiety, explaining that he does "not like people."  (R. at 51.)  Plaintiff said that "[j]ust being out in public can trigger a panic attack."  (R. at 56-57.)  He indicated that the length of any panic attack can vary, but that he had one that lasted "a couple of hours."  (R. at 56.)  He also testified that he does not sleep well and has poor concentration.  (R. at 53.)  He stated that he visits his family twice a week and that he talks on the phone with his sister, godmother, and his best friend.

Plaintiff stated that he sees a psychiatrist approximately every two months and a counselor every other week.  (R. at 58.)  His medications include Prozac, Neurontin, Naproxyn, Abilify, Strattera, and Klonopin.  (R. at 59.)  He said his only side effect is feeling a "[l]ittle tired at times."  (R. at 60.)

When discussing his back pain, Plaintiff testified that it sometimes radiates to both legs, especially if he is lifting "something of any weight."  (R. at 60-61.)  He explained that he experienced pain when he tried lifting a bag of grain to help his dad unload it to take care of his horses.  Plaintiff testified that he could only sit for twenty minutes at a time and then stand up for five or ten minutes before sitting down again.  (R. at 60.)

As to his activities of daily living, Plaintiff testified that he watches television, helps do household chores "when he can" such as sweeping, shops once a month (but not alone), goes to his parents, cares for his dog, uses the internet to check his Facebook account, texts his partner on his cell phone four-to-five times a day, helps cook for an elderly friend of the family with whom he resides, visits his parents for about 15 minutes once or twice a week, and speaks with his sister, godmother, and best friend on the phone.  (R. at 51, 57, 61-65.)  He also added that he

3

went to the store American Eagle after Christmas to shop.  He said he had not been horseback riding for over a year because it caused pain to his back.

Plaintiff testified that he could only sit for twenty minutes at a time and then stand up for five or ten minutes before sitting down again.  (R. at 60.)  He said he would sweep or cook or do other housework for about thirty minutes before needing to take a break.

**B.** **Vocational Expert Testimony**

The vocational expert ("VE") testified at the administrative hearing that Plaintiff's past jobs included a home attendant, a medium semi-skilled position; a state-tested nursing assistant, also a medium, semi-skilled position; a cashier, a light, unskilled position; and a bank teller, a light, skilled position.  (R. at 68-69.)

The ALJ proposed a series of hypotheticals to the VE premised upon an individual of Plaintiff's age, education, and past work experience.  (R. at 69-73.)  The ALJ first asked the VE to consider such an individual with the residual functional capacity ("RFC") to perform light work except that he can only occasionally climb ladders, ropes, and scaffolds, stoop, kneel, crouch or crawl and that the individual could work in a relatively static environment characterized by infrequent changes or duties or processes that does not involve fast work pace. The VE testified that the hypothetical individual could perform approximately 105,300 light exertion, unskilled jobs in the national economy such as a warehouse checker, hand packager, or bench assembler.  (R. at 70-71.)  The VE indicated that such an individual could not perform work at the sedentary level, however, if an additional limitation of "no more than occasional contact with supervisors and coworker and no public conduct" was added.  (R. at 71.)

The VE further testified that if someone exhibiting the limitations and restrictions discussed in Plaintiff's testimony, including alternating positions, social isolation, panic episodes, and impaired concentration and memory, the VE testified that such limitations would preclude all work. (R. at 73.)

When examined by Plaintiff's counsel, the VE testified that if Plaintiff was found to have the limitations Dr. Guisinger opined, which limited Plaintiff to sedentary work with a sit/stand option and the opportunity to lie down throughout the day, he could not sustain employment because "the employer's not going to tolerate an hour for the individual to lie down." (R. at 75.)

### III. MEDICAL RECORDS

#### A. Physical Impairments

#### 1. Prakash Kudlapur, M.D.

Plaintiff saw Dr. Kudlapur on June 25, 2010, to establish care. Dr. Kudlapur diagnosed Plaintiff with depression and bipolar and prescribed psychotropic medication, Lexapro and Klonopin. (R. at 345.) Plaintiff did not complain of pain at this visit or during his July 2010 visit. (R. at 344.)

In October 2010, Plaintiff complained of pain that he rated at a 5 on a 0-10 visual analog scale. In November 2010, he complained of stomach pain that he rated at a level 8. In January 2011, Plaintiff complained of back pain severity at a level of 7 or 8 on a 0-10 visual analog scale. (R. at 341.) A January 18, 2011 MRI of Plaintiff's lumbar spine revealed that the screw from his laminectomy remained in place.[1] The findings were otherwise normal, and the radiologist found

---

[1]Plaintiff underwent a L-5 fusion surgery in 2007. (R. at 485, 500.) The surgical records are not contained in the administrative record.

no evidence of new herniated discs or spinal stenosis.  (R. at 324.)  In March 2011, Plaintiff still complained of lower back pain with a severity of 8 on a 1-10 visual analog scale.  (R. at 341.)

When seen for medical refill on June 21, 2011, Dr. Kudlapur listed Plaintiff's diagnoses as depression and anxiety, and he refilled Plaintiff's psychotropic medication.  (R. at 360.)  The treatment note does not reflect any complaints of pain during this visit.

### 2.    Kent Guisinger, D.O.

Plaintiff treated with primary care physician, Dr. Guisinger from January 23, 2011, through at least September 4, 2012.  (R. at 385-97, 440-48, 490-501.)

On February 18, 2011, Dr. Guisinger found a positive straight leg raising on examination and assessed degenerative disc disease and degenerative joint disease.  (R. at 394.)  Plaintiff rated his pain at an 8 on a 0-10 visual analog scale.

Dr. Guisinger's clinical notes show that Plaintiff continued to complain of lower back pain, depression, and anxiety throughout 2011 and 2012.  Dr. Guisinger prescribed Percocet, Oxycodone, Neurontin, and Gabapentin for pain; and Klonopin, a psychotropic medication, for Plaintiff's depression and anxiety.  (R. at 385-94, 440-48, 490, 494.)

In June 2011, Plaintiff requested an increase in his pain medication because the aqua therapy he was doing made the pain worse.  (R. at 390.)  On September 19, 2011, Plaintiff reported that he had been to the hospital because of a drug overdose, but that he did not want to talk about it and did not want to follow up with a doctor at that practice.  (R. at 386.)  Dr. Guisinger noted that Plaintiff's mom agreed to administer his medication from then on.  When seen for medication refill on October 7, 2011, Dr. Guisinger noted that Plaintiff's mother was

watching his medication for him and described Plaintiff's psychological state to be stable. (R. at 385.) He recommended that Plaintiff continue drug abuse recovery counseling.

A November 14, 2011 MRI of Plaintiff's lumbar spine reflected no additional disc degeneration, disc protrusion, canal recess or formen stenosis and reflected normal findings beyond the screw fusion. (R. at 412.)

On February 27, 2012, Dr. Guisinger completed a RFC questionnaire in which he reported that he had treated Plaintiff for over two years under the diagnoses of lumbar degenerative disc disease, chronic low-back pain, and a lumbar herniation. He also noted that Plaintiff had been diagnosed with bipolar disorder. He identified Plaintiff's symptoms as pain, fatigue, and muscle weakness. He opined that Plaintiff's symptoms would frequently interfere with his attention and concentration. He indicated that Plaintiff experienced drowsiness as a side effect of his medications. Dr. Guisinger opined that Plaintiff would need to recline or lie down in excess of typical breaks in a workday and take 15-minute breaks every 15 minutes. He also opined that Plaintiff could walk a half block; sit for 15 minutes at a time and three hours total; stand/walk 30 minutes at a time and three hours total, and that he would need to be able to shift position at will. He also opined that Plaintiff could frequently lift up to 10 pounds and occasionally lift up to 50 pounds. (R. at 420-21.) He further opined that Plaintiff was likely to absent from work three or four times per month due to his medical impairments.

### 3. Jeffery Lobel, M.D.

On March 14, 2011, Plaintiff saw orthopedic surgeon, Dr. Lobel, for consultation of a four-week history of low back pain. Dr. Lobel noted Plaintiff's history of status post AxiaLIF procedure from 2007. Plaintiff reported having severe low-back pain that had limited all of his

activities of daily living. Plaintiff reported that he had fallen and hurt his back and since had some difficulty with ambulation. He also told Dr. Lobel that he used a cane occasionally and that he was unable to sit for twenty minutes. Plaintiff rated his pain severity at a level of 9 on a 0-10 visual analog scale and noted his pain is equally distributed between both lower extremities and his low back.

On examination, Dr. Lobel observed that Plaintiff could toe walk, heel-walk, and deep knee bend without assistance. His deep tendon reflexes were 2/4. Plaintiff's sensory exam was within normal limits and revealed no overt deficit that Dr. Lobel could appreciate. Dr. Lobel concluded that based upon the kind of work Plaintiff was performing, he would have no specific difficulties returning to work. Dr. Lobel indicated that Plaintiff was released "back to work from my standpoint in full capacity," and indicated that there were "no additional surgical offerings that [he could] give him at this time." (R. at 500-01.)

### 4. Ohio State University's Spine Center/Michael F. Evers, D.O.

Plaintiff was evaluated by Dr. Evers on May 19, 2011, complaining of lower back pain radiating into his lower extremities. Plaintiff rated his pain severity at a level of 7 on a 0-10 visual analog scale and reported having the pain for six years. (R. at 329.) Dr. Evers noted that Plaintiff was not in acute distress. On examination, Plaintiff ambulated with a slow gait but did not display antalgia. He could heel and toe walk without difficulty. Plaintiff was able to perform a squat and stand erect without complaining of pain and bend at the waist and touch his knees. Plaintiff had normal range of motion in extension and did not complain of pain with facet loading in the lumbar region. Dr. Evers found minimal tenderness to palpation of the lumbar spine in the midline. Plaintiff's motor strength was intact and 5/5 in the lower extremities at hip

flexors, abductor, adductor, quadriceps, foot dorsiflexors, plantar flexors, and extensor hallucis longus.  His sensation was intact to light touch in the lower extremities bilaterally.  Straight leg raising was negative in Plaintiff's lower extremities.  Dr. Evers assessed low back pain and postlaminectomy pain syndrome.  They discussed options for the treatment.  Plaintiff informed Dr. Evers that at that time, he was referred to physical therapy and would be participating in either office-based or aqua therapy.  Plaintiff also reported that he was prescribed oxycodone, which he said reduces his pain from an average daily level of 8-9/10 down to 3/10.  He reported that this medication allowed him to continue to work and perform his activities of daily living.  Plaintiff also told Dr. Evers that he has had epidural steroid injections in the past and had serious side effects and was not willing to undergo injections.  (R. at 329-30.)

###     5.      State-Agency Evaluation

On December 27, 2011, state-agency physician, Eli Perencevich, M.D., reviewed the record and assessed Plaintiff's physical functioning capacity.  Dr. Perencevich opined that Plaintiff could lift, carry, push, and pull up to 20 pounds occasionally and 10 pounds frequently; sit about six hours in an eight-hour work day; and stand and/or walk about six hours in an eight-hour work day.  (R. at 85-86.)  Dr. Perencevich also found that plaintiff could occasionally climb ladders/rope/scaffolds, stoop, kneel, crouch or crawl.  (R. at 86.)  Dr. Perencevich found Plaintiff's statements only partially credible, noting that Plaintiff alleges that he is only able to walk 150 feet before resting but such limitation is not supported by the objective medical evidence of record.  (R. at 85.)  Another state-agency physician, Edmond Gardner, M.D., reviewed the record upon reconsideration and essentially affirmed Dr. Perencevich's assessment in June 2012.  (R. at 110-14.)

### 6. Dona D. Alba, D.O.

On September 24, 2012, Plaintiff presented to Dr. Alba with complaints of lumbar back pain, stiffness and decreased range of motion. Plaintiff indicated that his pain radiated to his legs. Plaintiff described the pain as sharp and lasting for nine hours at a time on a daily basis. (R. at 485.) He reported that since his diagnosis of chronic low back pain five years prior, he had been improving, but that the pain had recently worsened because he had been sitting in a chair nine hours per day at school. (*Id*.) Plaintiff asked Dr. Alba to increase his Neurontin pain medication because he was sitting in school for prolonged periods of time. Plaintiff also reported that he was experiencing anxiety and that he avoids people. He additionally reported difficulty forming relationships since his rape.

Upon physical examination, Dr. Alba found that Plaintiff displayed normal posture and normal gait, with no impairment of tandem walking or walking on toes or heels. (R. at 486-87.) His examination of Plaintiff's spine reflected normal findings with no swelling or spasms. (R. at 487.) He noted that Plaintiff characterized his pain as "pain on movement." (*Id*.) Dr. Alba also performed a mental status examination and reported normal findings. Dr. Alba stated that Plaintiff "was currently able to do activities of daily living without limitations and able to work without limitations." (R. at 485.)

At a visit on November 27, 2012, Plaintiff complained of back pain, anxiety, and a change in his sleep patterns and moods. (R. at 482.) He indicated that the increase in Neurontin improved his pain from 10-25% and described his pain as "moderate in severity and improving." (*Id*.) He indicated that when he increased his mid-day pain medication dosage too much, it

caused his head to feel "fuzzy," and that it did not cause a big improvement in pain so he lowered his mid-day dosage again.

Dr. Alba described Plaintiff as oriented with an "appropriate" mental status affect.  She again noted that Plaintiff's gait was normal.  Dr. Alba also noted that she had received a request for information pertaining to his application for Social Security disability benefits, that she reviewed the questions with Plaintiff, and that they "made an estimation of his functional status based upon what he had told [her] during his initial visit and his level of functioning now."  (R. at 484.)  She indicated that she did not complete the mental capacity statement because Plaintiff indicated that he had a Psychiatrist who he preferred to address those limitations.

## B.    Mental Impairments

### 1.    Tri-County Health and Counseling Services ("Tri-County").

Plaintiff sought mental health treatment at Tri-County on November  9, 2011.  (R. at 398-404.)  Plaintiff reported that he "is in the process of pursuing disability for mental health symptoms."  He also indicated that he would like counseling to manage and regulate his emotions effectively. (R. at 398.)  Plaintiff described manic episodes and said that he did not want human contact.  (*Id.*)  Plaintiff reported that in 2006, he was the victim of a gang rape.  (R. at 400, 403.)  Plaintiff's mental status examination reflected normal findings.  Plaintiff was found to be well groomed, and his demeanor, eye contact, and activity were all found to be average.  He reported no delusions or hallucinations, but did report flashbacks.  Plaintiff's mood was found to be "[i]ncongruent with reports of depressive symptoms," and he was described as "animated."  (R. at 404.)  He had full affect and cooperative behavior with no impairment of cognition.  His insight and judgment were also found to be average.  (R. at 404.)  Plaintiff was

diagnosed with Post-Traumatic Stress Disorder ("PTSD") and Bipolar Disorder. He was assigned a Global Assessment of Functioning ("GAF") score of 65.[2] (R. at 401.) It was noted that Plaintiff was receiving medication management from his primary care physician, Dr. Guisinger, and was to continue. (R. at 400.)

When seen on November 18, 2011, Plaintiff reported that he was sexually molested by an uncle during his childhood. He indicated that his parents are supportive. Plaintiff also reported that his mood and sleep had improved with the change in his medications. (R. at 405.)

When seen in December 2011, the therapist described Plaintiff as having an "improved mood" and "bright affect." (R. at 480.) In January 2012, Plaintiff reported that a suspected rapist in his neighborhood was triggering trauma. The therapist observed that Plaintiff's mood had again improved and was "stable." (R. at 479.) She continued to work with Plaintiff on coping strategies to manage and reduce anxiety stemming from his trauma.

On February 1, 2012, Plaintiff was evaluated by psychiatrist, Arthur Thalassinos, M.D. (R. at 433-37.) Plaintiff told Dr. Thalassinos that he was had been raped five years prior but never told anybody until he started seeing a counselor after having flashbacks and nightmares. (R. at 433-34.) He represented that he stayed with a friend for free in exchange for taking care of her mother. (R. at 433.) Plaintiff indicated that the counseling had been "helping a lot" and described his mood as "not too bad." (R. at 433.) He reported that he was depressed because he could no longer ride horses due to his back surgery.

---

[2]The GAF scale is used to report a clinician's judgment of an individual's overall level of functioning. Clinicians select a specific GAF score within the ten-point range by evaluating whether the individual is functioning at the higher or lower end of the range. A GAF score of 61-70 corresponds to some mild symptoms or difficulties in functioning. *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 33-34.

Dr. Thalassinos performed a mental status examination and observed Plaintiff to be "alert, oriented, casual, [and] neat." (R. at 436.) Plaintiff displayed good eye contact, regular speech, and had euthymic mood with an subdued affect. Dr. Thalassinos described Plaintiff's thoughts as coherent, his cognition as average, and his insight and judgment as intact. (*Id*.) He diagnosed Plaintiff with depressive disorder, PTSD, and noted that he suffered from a history of Bipolar Type II and polysubstance abuse (cocaine) in the past. (R. at 437.) He also noted that Plaintiff's "bad coke problem when he was younger [was the] cause of losing all his teeth." (R. at 436.) He recommended that Plaintiff continue both counseling and his current medications, which included Klonopin, Abilify, and Celexa. (*Id.*)

On May 9, 2012, Plaintiff reported to his therapist that his thoughts were preoccupied with rape and that he had an increase in anxiety. His therapist described Plaintiff's mood as "euthymic." (R. at 476.)

On May 21, 2012, Plaintiff reported to Dr. Thalassinos that he was "not too bad," but he described his mood as unstable and reported staying in bed for two days and hardly eating when he feels depressed. (R. at 475.) Dr. Thalassinos noted that Plaintiff had reported no anxiety symptoms on April 16, 2012. He continued Plaintiff's diagnoses of depression and PTSD, and increased his Abilify prescription. (R. at 474-75.)

On June 25, 2012, Plaintiff reported to Dr. Thalassinos that he doing spring cleaning and that he would like to get his own apartment if he received disability benefits. (R. at 472.) Dr. Thalassinos indicated that Plaintiff was "not too bad" and that his mood was better and less depressed. (R. at 472.) On June 29, 2012, Plaintiff reported to his therapist that he was "avoiding people [and] places due to anxiety." (R. at 470.) His therapist described his mood as

"euthymic" and "somewhat flat." (*Id*.) She indicated that she worked with Plaintiff on breathing exercises to improve his "emotional regulation." (R. at 470.)

On July 20, 2012, Plaintiff's therapist noted that Plaintiff's mood was "euthymic, bright, [and] improved." (R. at 469.) She also described Plaintiff as exhibiting a positive thinking style and noted that he had no panic attacks. (*Id*.)

On August 20, 2012, Plaintiff reported to Dr. Thalassinos that he was "not too bad," but that he had been "a little moodier" due to being off his percosets. (R. at 467.) Dr. Thalassinos described Plaintiff's mood as "pretty good." (*Id.*)

On November 8, 2012, Dr. Thalassinos noted that Plaintiff's current and past problems with concentrating and focusing could be attention deficit hyperactivity disorder ("ADHD"). (R. at 459.) In September 2012, Plaintiff reported that he was a full-time student and had improved mood, decreased depression, and improved self-esteem. (R. at 465.) On October 10, 2012, Plaintiff reported to his therapist that he had improved, but had increased anxiety and PTSD triggers due to a rape video in class. He reported that he was doing "very well managing full time classes." (R. at 463.) On October 18, 2012, he reported to Dr. Thalassinos that he was doing "pretty good," was sleeping okay, and was more stable and less depressed. On October 26, 2012, Plaintiff's therapist described his mood as "improved" and his affect as "euthymic." (R. at 460.) He also noted that his back pain had decreased. (*Id*.) In November 2012, Plaintiff reported to Dr. Thalassinos that he was having problems concentrating, focusing, and paying attention in school and that his grades were declining. (R. at 459.) Plaintiff described his mind as wondering everywhere. Dr. Thalassinos discussed the possibility with Plaintiff that he might have attention deficit hyperactivity disorder ("ADHD"). (*Id*.) In December 2012, Plaintiff

14

reported to Dr. Thalassinos that he was "not too bad," that his sleep was good, and that his mood was pretty good.  (R. at 503.)  Dr. Thalassinos noted that Plaintiff was tolerating his medications.  (R. at 502.)

In February 2013, Dr. Thalassinos described Plaintiff has stable with intact insight and judgment.  (R. at 505.)  Plaintiff again reported that he was "not too bad," doing well in school, and that his mood was "pretty good."  (R. at 506.)  He also reported that he had visited his parents and sister over the holidays.

In March 2013, Plaintiff reported that he was called a name based upon his sexual preference and that he had failed his certification for medical billing class.  (R. at 508-09.)  He reported feeling sleepy, depressed, anxious, and increased anger.  The therapist discussed coping strategies and urged him to maintain substance abstinence.  (*Id*.)  Plaintiff reported continued issues with school in April 2013.  His therapist described him as "rumanitive" with adequate behavior and functioning.  (R. at 514.)

In May 2013, Plaintiff reported to his therapist that he was no longer going to school due to his grades.  (R. at 516.)  He reported that his sleep was good but that he had increased anxiety.  He reported to Dr. Thalassinos that he was "a little more anxious because of his [Social Security] hearing next week," but that he was sleeping "pretty good."  (R. at 518.)  Dr. Thalassinos described Plaintiff's mood as good.  (*Id*.)  He continued Plaintiff's diagnoses and medications.

### 2.    Marc Miller, Ph.D.

Plaintiff was evaluated for disability purposes by Dr. Miller on November 28, 2011.  (R. at 413-17.)  Plaintiff reported that he lived with a family friend and that he "help[s] take care of her."  (R. at 413.)  Plaintiff also indicated that he gets along well with his parents and keeps in

contact with his sister.  Dr. Miller noted that Plaintiff attempted to end his life in 2006.  Plaintiff reported no history of psychiatric inpatient.  (R. at 414.)  Plaintiff discussed his physical and sexual abuse by a group of men six years prior, stating that he was "severely beaten" and now requires dentures because "they kicked my teeth out."  (*Id.*)  Dr. Miller noted that Plaintiff drove himself to the evaluation and was prompt.  Plaintiff reported that he had no hobbies, drove short distances, helps with an elderly person, watches television, cooks, does laundry, cleans, does dishes, performs the grocery shopping, and takes care of money management.  (R. at 416.)

On mental status examination, Dr. Miller observed that Plaintiff's hygiene was fair and that his behavior was cooperative, friendly, and mannerly.  He described Plaintiff's eye contact as good and noted that no crying behavior was observed or reported.  Plaintiff did report some mind racing and worrying in the evening hours, but none during the day.  Plaintiff was oriented x4.  Plaintiff recalled 3/3 items after 5 minutes.  He was not able to spell the word "world" in reverse.       Plaintiff denied panic attacks, but complained of some irritability and impatience.  Dr. Miller indicated that Plaintiff mental content "notes suspiciousness and mistrust toward others."  (R. at 416.)  Dr. Miller found that Plaintiff's insight and judgment "indicate[d] no difficulty" and that his "[s]ocial adaptation is good," but that his motivation is poor.  (*Id.*)

Dr. Miller diagnosed moderate dysthymic disorder, moderate anxiety, and chronic PTSD.  (*Id.*)  Dr. Miller assigned Plaintiff GAF score of 50 "in regard to the severe beating and rape in 2006," and his lack of a job and income.  (R. at 417.)  Dr. Miller opined that Plaintiff had no difficulty interacting with supervisors, coworkers, and the public or in his ability to remember and carry out instructions.  He explained that Plaintiff generally got along well with others and was only fired from a job due to medication issues.  He further opined that Plaintiff would have

16

"some difficulty" maintaining his attention span and concentrating, "possibly due to [Plaintiff's] anxiety issues."  (R. at 416.)  He also opined that Plaintiff's "abilities and limitations in regard to dealing with stress and pressure in a work setting note impairment" due to his anxiety and PTSD. (R. at 417.)

### 3.     State-Agency Evaluations

On December 5, 2011, after review of Plaintiff's medical record, Todd Finnerty, Psy.D., a state-agency psychologist, assessed Plaintiff's mental condition and opined that Plaintiff had mild restrictions in his activities of daily living; mild difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace; with no episodes of decompensation of an extended duration.  (R. at 84.)  He further determined that the evidence did not establish the presence of the "C" criteria.  (*Id.*)  Dr. Finnerty found Plaintiff to be partially credible and even though he has been diagnosed with mental health conditions, they do not prevent all work activity.  (R. at 85.)  He also found that the conclusions offered by Dr. Miller are generally consistent with the evidence.  (*Id.*)  Dr. Finnerty opined that Plaintiff "can sustain a static set of tasks without fast pace" and "can adapt to settings without frequent changes."  (R. at 87-88.)

Paul Tangeman, Ph.D., reviewed the record upon reconsideration and affirmed Dr. Finnerty's assessment in April 26, 2012.  (R. at 110-15.)

Ruth Ann Lyman, Ph.D., reviewed the record on November 29, 2012, and concluded that the "[a]dditional evidence available . . . [was] considered and does not alter prior decisions."  (R. at 488-89.)  In connection with her review, Dr. Lyman summarized Plaintiff's recent treatment notes before affirming the assessments of Drs. Finnerty and Tangeman.

## IV.  THE ADMINISTRATIVE DECISION

On June 26, 2013, the ALJ issued his decision.  (R. at 23-33.)  Plaintiff met the insured

status requirements through the date of his decision.  At step one of the sequential evaluation

process,[3] the ALJ found that Plaintiff had not engaged in substantially gainful activity since May

26, 2011, the alleged onset date.  (R. at 25.)  The ALJ found that Plaintiff had the severe

impairments that can best be described as status post lumbar spine laminectomy, a depressive

disorder, a generalized anxiety disorder, a post-traumatic stress disorder (PTSD), and attention

deficit disorder (ADD).  (*Id.*)  He further found that Plaintiff did not have an impairment or

combination of impairments that met or medically equaled one of the listed impairments

described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 26.)  At step four of the

sequential process, the ALJ set forth Plaintiff's RFC as follows:

> After careful consideration of the entire record, the [ALJ] find[s] that [Plaintiff] has
> the residual functional capacity to perform light work as defined in 20 CFR
> 404.1567(b) and 416.967(b) except he can occasionally climb ladders/ropes/
> scaffolds, stoop, kneel, crouch, and crawl.  He can perform work in a relatively static

---

[3] Social Security Regulations require ALJs to resolve a disability claim through a five-step
sequential evaluation of the evidence.  *See* 20 C.F.R. § 416.920(a)(4).  Although a dispositive finding at
any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully
considered, the sequential review considers and answers five questions:

1.    Is the claimant engaged in substantial gainful activity?
2.    Does the claimant suffer from one or more severe impairments?
3.    Do the claimant's severe impairments, alone or in combination, meet or
        equal the criteria of an impairment set forth in the Commissioner's Listing of
        Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.    Considering the claimant's residual functional capacity, can the claimant
        perform his or her past relevant work?
5.    Considering the claimant's age, education, past work experience, and residual functional
        capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009);
*Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

environment characterized by infrequent changes to duties or processes that does not involve a fast work pace.

(R. at 28.)  In reaching this determination, the ALJ accorded "significant weight" to the opinions of the state-agency reviewing psychologists and physicians, explaining that their "opinions are consistent with the medical record in its entirety" and they are "well-qualified by reason of training and experience in reviewing an objective record and formulating an opinion as to limitations."  (*Id.*)  The ALJ also found the state-agency opinions "consistent with and well supported by the evidence of the record as a whole."  (R. at 29.)  The ALJ accorded "some weight" to Dr. Miller's assessment finding that while his opinion was "somewhat vague," it was "generally consistent with the medical evidence of record and with other credible medical opinions."  (*Id.*)  The ALJ assigned "minimal weight" to Dr. Guisinger's assessment, finding it "to be primarily based upon the claimant's subjective complaints of pain, fatigue, muscle weakness, and drowsiness as the totality of the medical evidence of record as discussed herein does not support a finding that would limit the claimant to sitting, standing, and walking for less than a total of six hours in an eight-hour day or a finding that the claimant would be absent from work three-to-four times per month."  (*Id.*)

Relying on the VE's testimony, the ALJ concluded that Plaintiff can perform jobs that exist in significant numbers in the national economy.  (R. at 31-33.)  He therefore concluded that Plaintiff was not disabled under the Social Security Act.  (R. at 33.)

## V.   STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009)

19

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. §

405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by

substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is

defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486

F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must

"'take into account whatever in the record fairly detracts from [the] weight'" of the

Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial

evidence supports the ALJ's decision, this Court defers to that finding 'even if there is

substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley*

*v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.

1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision

of the Commissioner will not be upheld where the SSA fails to follow its own regulations and

where that error prejudices a claimant on the merits or deprives the claimant of a substantial

right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746

(6th Cir. 2007)).

## VI.   ANALYSIS

In his Statement of Errors, Plaintiff first challenges the ALJ's consideration and weight

assigned to the opinion of Dr. Guisinger concerning his physical limitations. Plaintiff next

asserts that the ALJ erred in his consideration of Dr. Miller's opinion. Finally, Plaintiff

challenges the ALJ's credibility assessment.  The Undersigned considers each of these contentions of error in turn.

## A.      Consideration of Dr. Guisinger's Opinion

Within this contention of error, Plaintiff maintains that the ALJ erred in assigning "minimal weight" to Dr. Guisinger's opinion "where no other examining physician had opined as to Plaintiff's physical limitations."  (Pl.'s Statement of Errors 12, ECF No. 13.)  Plaintiff also maintains reversal is warranted because the ALJ failed to "undergo a detailed, multi-factored analysis of the opinion," adding that the ALJ failed to make any effort to examine the length and extent of the treatment relationship between he and Dr. Guisinger.  (*Id*. at 14.)  Finally, Plaintiff asserts that it was error to credit the state-agency physicians' opinion over Dr. Guisinger's opinion because they did not benefit from the entire record.  The Undersigned finds no error with the ALJ's consideration and weighing of the evidence in connection with formulating Plaintiff's RFC.

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case.  20 C.F.R. § 416.927(c).  The applicable regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical

evidence that cannot be obtained from the objective medical filings alone . . ."  20 C.F.R. § 416.927(c)(2);  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009).  If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight."  20 C.F.R. § 404.1527(c)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors-namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source-in determining what weight to give the opinion.

*Id*.  Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion."  20 C.F.R. § 416.927(c)(2).  Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted).  The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied."  *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and

permits meaningful review of the ALJ's application of the rule.  *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45.  Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled."  *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 Fed. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).  There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors within the written decision.  *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir. 2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical opinion evidence within the written decision).

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity.  20 C.F.R. § 404.1527(d).  Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance.  20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

The Undersigned finds no error with the ALJ's consideration and weighing of Dr. Guisinger's opinion.  The ALJ explained the weight assigned to Dr. Guisinger as follows:

> Minimal weight is given to the opinion of Dr. Kent Guisinger dated February 27, 2012.  This opinion appears to be primarily based upon [Plaintiff's] subjective complaints of pain, fatigue, muscle weakness, and drowsiness as the totality of the medical evidence of record and discussed herein does not support a finding that would limit [Plaintiff] to sitting, standing, and walking for less than a total of six hours in an eight-hour day or a finding that [Plaintiff] would be absent from work three-to-four times per month.

(R. at 42.)

23

The Undersigned concludes that the ALJ offered good reasons for discounting Dr. Guisinger's opinion.  As the ALJ points out, Dr. Guisinger's opinon appears to based upon Plaintiff's subjective self reports, which the ALJ found to be not credible.  Review of Dr. Guisinger's treatment notes reflect almost no objective testing, observations, or findings that would support the extreme limitations he found.  Indeed, in correspondence dated March 14, 2011, Dr. Lobel, an orthopaedic specialist who had previously treated Plaintiff, informed Dr. Guisinger that even though Plaintiff rated his pain severity level at a level 9 on a 0-10 visual analog scale, his physical examination of Plaintiff was essentially normal and that he was released "back to work from my standpoint in full capacity."  (R. at 500-01.)  Consistently, the November 2011 MRI Dr. Guisinger ordered, like Plaintiff's January 2011 MRI, demonstrated that Plaintiff's lumbar spine showed no additional disc degeneration, disc protrusion, canal recess or formen stenosis and reflected normal findings beyond the screw fusion.  (R. at 341, 412.)  The Undersigned finds no error with the ALJ's discounting of Dr. Guisinger's opinions under these circumstances.  *See* 20 C.F.R. § 404.1527(c)(3) (identifying "supportability" as a relevant consideration); *see also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 877 (6th Cir. 2007) (holding that physicians' opinions are not due much weight when premised upon on reports made by a patient that the ALJ found to be incredible); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 (6th Cir. 2009) ("Here, substantial evidence supports the ALJ's determination that the opinion of [the claimant's] treating physician was not entitled to deference because it was based on [the claimant's] subjective complaints, rather than objective medical data.").

In addition, the ALJ reasonably discounted Dr. Guisinger's opinion as inconsistent with the other evidence in the record.  *See* 20 C.F.R. § 404.1527(c)(3) (identifying "consistency" with

the record as a whole as a relevant consideration).  The ALJ reasonably found that the objective

medical evidence in the record "fails to document the presence of any impairment or

combination of impairments" that would support the limitations Dr. Guisinger found.  (R. at 29.)

The ALJ specifically highlighted the January and November 2011 MRI findings and Dr. Lobel's

examination findings and opinion.  (R. at 30.)  The ALJ also cited Dr. Alba's treatment records,

citing in particular a treatment note from September 24, 2014.  (*Id*.)  During Plaintiff's

September 24, 2014 appointment, he complained of sharp, long-lasting back pain, as well as

anxiety and avoiding people.  Dr. Alba, however, noted that both his physical examination and

mental status examination yielded normal findings and stated that Plaintiff "was currently able to

do activities of daily living without limitations and able to work without limitations."  (R. at

485.)

 Plaintiff's contention that the ALJ erred in assigning "minimal weight" to Dr.

Guisinger's opinion "where no other examining physician had opined as to Plaintiff's physical

limitations," (Pl.'s Statement of Errors 12, ECF No. 13), lacks merit.  Plaintiff has not identified

and the Court is not aware of any authority that would support such a proposition.  Rather, "'it is

an error to give an opinion controlling weight simply because it is the opinion of a treating

source if . . . it is inconsistent the with other substantial evidence in the case record.'"  *Blakley*,

581 F.3d at 406 (quoting SSR 96-2p, 1996 WL 374188, at *2 (July 2, 1996)).  Moreover, as set

forth above, the Commissioner reserves the power to decide certain issues such as a claimant's

RFC.  20 C.F.R. § 404.1527(d).

 Plaintiff's assertion that reversal is warranted because the ALJ failed to "undergo a

detailed, multi-factored analysis of the opinion" likewise lacks merit.  Plaintiff is correct, that the

ALJ must consider the length and extent of the treatment relationship between he and Dr. Guisinger, among other factors, in determining what weight to afford Dr. Guisinger's opinion. *See Wilson*, 378 F.3d at 544. There is no requirement, however, that the ALJ "expressly" consider each of the factors within the written decision. *See Tilley v. Comm'r of Soc. Sec.*, No. 09-6081, 2010 WL 3521928, at *6 (6th Cir. Aug. 31, 2010) (indicating that, under *Blakely* and the good reason rule, an ALJ is not required to explicitly address all of the six factors within 20 C.F.R. § 404.1527(d)(2) for weighing medical opinion evidence within the written decision). As discussed above, the ALJ discussed a number of these factors and provided legally sufficient reasons for assigning Dr. Guisinger's opinions minimal weight, satisfying *Wilson's* good-reason requirement.

Finally, Plaintiff's assertion that it was error to credit the state-agency physicians' opinion over Dr. Guisinger's opinion because they did not benefit from the entire record is unavailing. Social Security Ruling 96-6p, 1996 WL 374180 (July 2, 1996), states in pertinent part:

> In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources. For example, the opinion of the State agency medical or psychological consultant . . . may be entitled to greater weight than a treating source's medical opinion if the State agency medical or psychological consultant's opinion is based on a review of a complete case record that includes a medical report from a specialist in the individual's particular impairment which provides more detailed and comprehensive information than what was available to the individual's treating source.

1996 WL 374180 at *3. This language does not require the conclusion that a state-agency opinion cannot be credited if it is not based on a review of the entire records. *Cf. Hess v. Colvin*, No. 3:14-cv-401, 2015 WL 8381448, at *3 (S.D. Ohio Dec. 10, 2015) (noting that Social Security Ruling 96-6p "does not say that a nontreating or nonexamining medical source's

26

opinions are given more weight only when they review a more complete record than the record before the treating source" and stating that instead, "the completeness of the record is one of many factors used to weigh state-agency source's opinions").  Here, the ALJ acknowledged that additional evidence was added to the record after the state-agency physicians rendered their opinions, but appropriately concluded that the additional evidence "did not provide any credible or objectively supported new and material information that would significantly alter the State Agency consultants' findings."  (R. at 29.)  The Undersigned finds that this conclusion is supported by substantial evidence and finds no error with the ALJ's consideration and weighing of the state-agency consultants' opinions concerning Plaintiff's physical limitations.

In sum, the Undersigned finds no error with the ALJ's consideration and weighing of Dr. Guisinger's opinion.  It is therefore **RECOMMENDED** that Plaintiff's first contention of error be **OVERRULED**.

**B.      Consideration of Dr. Miller's Opinion**

Within this contention of error, Plaintiff contends that the ALJ erred in according any weight to Dr. Miller's opinion that he had no restriction with respect to social functioning.  In support of this assertion, Plaintiff maintains that the record is replete with evidence of Plaintiff limiting his interaction with others due to his PTSD.

The Undersigned concludes that substantial evidence supports the ALJ's assignment of "some weight" to the opinion of examining physician Dr. Miller and his rejection of limitations restricting his social interactions.  Dr. Miller indicated that Plaintiff's mental status examination was normal and that he displayed good social adaptation.  (R. at 414.)  He also noted that Plaintiff got along well with others and was only fired from a job due to his medication issues.

27

The ALJ assigned Dr. Miller's opinion "some weight," noting that it was vague with regard to some limitations, and concluded that it was "generally consistent with the medical evidence of record and with other credible evidence." (R. at 29.) The ALJ also found that Plaintiff had no more than mild difficulties in social functioning. (R. at 27.) He noted that Plaintiff resides with family friends, takes care of grocery shopping, gets along well with his parents and sister, has a few friends, talks to his godmother, and enjoys helping people. In addition, the ALJ assigned "significant weight" to the opinions of the state-agency reviewing physicians, all of whom concluded that Plaintiff did not require an RFC limitation relating to social functioning. (R. at 28-29.) And although the ALJ acknowledged Plaintiff's allegations relating to his anxiety around people, he found them to be not credible in light of the other evidence in the record. (R. at 29-30.)

In sum, the Undersigned finds no error with the ALJ's consideration and weighing of Dr. Miller's opinion or with his decision to exclude a limitation relating to social functioning from the RFC assessment. It is therefore **RECOMMENDED** that Plaintiff's second contention of error be **OVERRULED**.

## C. The ALJ's Credibility Assessment

Plaintiff next challenges the ALJ's credibility assessment. According to Plaintiff, the ALJ committed a number of errors in assessing his credibility. Specifically, Plaintiff challenges the ALJ's reliance on his activities of daily living, the inconsistent statements concerning his reasons for leaving work, his taking his friend's medication, and Dr. Lobel's opinion. Plaintiff also maintains the ALJ erred in failing to assess the side effects of his medications.

The Sixth Circuit has provided the following guidance in considering an ALJ's credibility assessment:

> Where the symptoms and not the underlying condition form the basis of the disability claim, a two-part analysis is used in evaluating complaints of disabling pain. 20 C.F.R. § 416.929(a); *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001); *Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994). First, the ALJ will ask whether the there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms. 20 C.F.R. § 416.929(a). Second, if the ALJ finds that such an impairment exists, then he must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities. *Id.*

*Rogers*, 486 F.3d at 247.

"The ALJ's assessment of credibility is entitled to great weight and deference, since he [or she] had the opportunity to observe the witness's demeanor." *Infantado v. Astrue*, 263 F. App'x 469, 475 (6th Cir. 2008) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)); *Sullenger v. Comm'r of Soc. Sec.*, 255 F. App'x 988, 995 (6th Cir. 2007) (declining to disturb the ALJ's credibility determination, stating that: "[w]e will not try the case anew, resolve conflicts in the evidence, or decide questions of credibility" (citation omitted)). This deference extends to an ALJ's credibility determinations "with respect to [a claimant's] subjective complaints of pain." *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652 (6th Cir. 2009) (quoting *Siterlet v. Sec'y of Health & Hum. Servs.*, 823 F.2d 918, 920 (6th Cir.1987)). Despite this deference, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Walters*, 127 F.3d at 531. Furthermore, the ALJ's decision on credibility must be "based on a consideration of the entire record." *Rogers*, 486 F.3d at 247 (internal quotation omitted). An ALJ's explanation of his or her credibility decision "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave

29

to the individual's statements and the reasons for that weight." *Id.* at 248; *see also Mason v. Comm'r of Soc. Sec. Admin.*, No. 1:06–CV–1566, 2012 WL 669930, at *10 (N.D. Ohio Feb. 29, 2012) ("While the ALJ's credibility findings 'must be sufficiently specific', *Rogers*, 486 F.3d at 248, the intent behind this standard is to ensure meaningful appellate review.").

"Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters*, 127 F.3d at 531.  In addition, the Regulations list a variety of factors an ALJ must consider in evaluating the severity of symptoms, including a claimant's daily activities; the effectiveness of medication; and treatment other than medication.  20 C.F.R. § 404.1529(c)(3); SSR 96–7p, 1996 WL 374186 (July 2, 1996); *but see Ewing v. Astrue*, No. 1:10–cv–1792, 2011 WL 3843692, at *9 (N.D. Ohio Aug. 12, 2011) (suggesting that although an ALJ is required to consider such factors, he or she is not required to discuss every factor within the written decision) (Report and Recommendation later adopted).

In the instant action, the Undersigned finds that substantial evidence supports the ALJ's credibility assessment.  In assessing Plaintiff's credibility, the ALJ properly considered the lack of significant objective medical evidence findings.  As discussed above, the ALJ pointed out that the MRI's of Plaintiff's back were essentially normal and showed no deterioration since his surgery in 2007.  (R. at 30 (discussing diagnostic testing results).)  The ALJ also pointed out that Plaintiff's treatment notes from 2012 indicated that he was "currently able to do activities of daily living without limitations and able to work without limitations."  (*Id.* (citing Dr. Alba's treatment notes, R. at 485).)  Consistently, treating specialist Dr. Lobel indicated that with regard

to his back impairments, Plaintiff was released "back to work from my standpoint in full capacity." (R. at 500-01.)

With regard to Plaintiff's mental impairments, the ALJ considered Plaintiff's treatment and counseling. He noted that Plaintiff's condition had improved per his own self reports to counselors and that his treatment providers described the counseling as "going real well." (R. at 30 (citing the treatment notes from Plaintiff's mental health counseling).) Consistent with the ALJ's observations, Plaintiff's mental health treatment notes reflect that his mental status examination findings were often normal and that there were several reports of stability and improved status. (*See, e.g.*, Tri-County 2011-2013 Treatment Records, R. at 479-80 (reflecting stable and "improved mood" and "bright affect"); R. at 436 (normal mental status examination findings); R. at 476 (describing Plaintiff's mood as "euthymic"); R. at 467, 475 (describing Plaintiff as "not too bad" despite his self reports); R. at 472 (describing Plaintiff as having a better mood and less depression); R. at 460, 469 (describing Plaintiff's mood as "euthymic, bright, [and] improved"); R. at 505 (describing Plaintiff as stable); and Nov. 2012 Treatment Note from Dr. Alba, R. at 484, (noting "appropriate" mental status affect).)

The ALJ also properly discounted Plaintiff's credibility because he found that the record contains inconsistent and exaggerated statements. By way of example, the ALJ pointed out the inconsistencies in Plaintiff's statements concerning why he left school, pointing out that he testified at the hearing that he left because of his grades, but reported to a physician that he saw one of his perpetrators and never returned to the school. (R. at 30.) Plaintiff maintains that the ALJ erred in discounting credibility on this ground because it was likely that he would be "more inclined to disclose information about his sexual abuse in the privacy of his therapists office than

31

during the course of a recording hearing before an ALJ he just met." (Pl.'s Statement of Errors 20, ECF No. 20.)  The problem with Plaintiff's argument is two-fold.  First, the inconsistencies in his statements concerning why he left school extended beyond the hearing.  Indeed, Plaintiff told his treating therapist that he was no longer in school due to his grades. (R. at 516.)  Second, although the ALJ offered this as an example, numerous other examples of exaggerations and inconsistencies exist in the record.  For example, although Plaintiff reported experiencing pain at a level of 9 on a 0-10 visual analog scale, treating specialist Dr. Lobel concluded that he would have no difficulties returning to work.  (R. at 500-01.)  Similarly, when Plaintiff treated with Dr. Evers, he rated his pain as a level 7, but Dr. Evers noted that Plaintiff was in no acute distress, and his examination findings were normal.  (R. at 329-330.)  And again in September 2012, Plaintiff reported that he had sharp back pain lasting for nine hours at a time, yet he was attending school and Dr. Alba had normal physical and mental status examination findings and concluded that "Plaintiff was currently able to do activities of daily living without restriction and able to work without limitation."  (R. at 10.)  Plaintiff's mental health treating counselor also found his mood "[i]ncongruent with reports of depressive symptoms," and the treatment records reflected normal mental status examination findings.  (R. at 404.)  Finally, although Plaintiff reported to Dr. Miller that he was so severely beaten during the rape incident that the perpetrators kicked his teeth out, (R. at 414), Dr. Thalassinos noted that Plaintiff lost all of his teeth when he was younger due to his severe cocaine addiction problem.  (*See* R. at 436 (noting that Plaintiff's "bad coke problem when he was younger [was the] cause of losing all his teeth.".) In sum, the ALJ did not err in discounting Plaintiff's credibility due to inconsistencies and exaggerations contained in the record.

The ALJ also properly relied upon Plaintiff's activities of daily living in assessing his credibility.  20 C.F.R. § 404.1529(c)(3); SSR 96–7p, 1996 WL 374186 (July 2, 1996); *See Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) ("The administrative law judge justifiably considered [the claimant's] ability to conduct daily life activities in the face of his claim of disabling pain."); *Walters*, 127 F.3d at 532 ("An ALJ may also consider household and social activities engaged in by the claimant in evaluating a claimant's assertions of pain or ailments.").  According to Plaintiff, the ALJ erred in relying on his activities of daily living because they fall short of establishing an ability to engage in full-time employment.  Plaintiff's argument is unavailing because the ALJ did not rely exclusively on his activities of daily living in formulating his RFC or assessing his credibility.  Rather, the ALJ properly considered Plaintiff's activities of daily living as one of several factors.

In addition, contrary to Plaintiff's assertions, the ALJ *did* consider Plaintiff's testimony concerning the alleged side effects of his medications.  (*See* R. at 30 (acknowledging Plaintiff's testimony that he is "a little tired" at times from the medications).)  According to Plaintiff, the ALJ should have also considered treatment records reflecting that twice Plaintiff made isolated reports of medication side affects.  The first record upon which Plaintiff relies is a hospital record from 2011 that involved complaints of acid reflux attributable to medications that Plaintiff no longer takes.  (R. at 371.)  The second record involves a complaint to his treating physician that his head was feeling "fuzzy" because he had increased his mid-day pain medications too much and that he simply lowered it again to resolve the issue.  (R. at 482.)  In contrast to these reports and Plaintiff's contentions of significant medication side effects, Dr. Thalassinos noted in December 2012 that Plaintiff was tolerating his medications.  (R. at 502.)

33

Regardless, the Undersigned concludes that the ALJ's failure to address the two isolated reports of side affects upon which Plaintiff relies, when he did not even identify those side effects at the hearing, does not deprive the ALJ's credibility assessment substantial evidence.

Finally, Plaintiff challenges the ALJ's notation that he took his friend's medication.  The Undersigned finds no error with the ALJ's consideration of Plaintiff's use of medication he was not prescribed.  Regardless, even if such consideration were somehow found to be an invalid basis upon which to discount credibility, such a finding would not require reversal because the Undersigned finds that substantial evidence otherwise supports that ALJ's credibility assessment as a whole.  *See Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012) (holding that when an ALJ relies on invalid reasons for discounting credibility, it amounts to harmless error so long as substantial evidence exists supporting the ALJ's conclusions on credibility).

In sum, it is **RECOMMENDED** that the Court decline to disturb the ALJ's credibility assessment and **OVERRULE** Plaintiff's final contention of error.

## VII.   CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits.  Accordingly, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner of Social Security's decision.

## VIII.   PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in

34

question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

Response to objections must be filed within fourteen (14) days after being served with a copy.

Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and

Recommendation will result in a waiver of the right to *de novo* review by the District Judge and

waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex

Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate

judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district

court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that

defendant waived appeal of district court's denial of pretrial motion by failing to timely object to

magistrate judge's report and recommendation).  Even when timely objections are filed,

appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d

981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to

specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation

omitted)).

Date: February 22, 2016                                   ___/s/ *Elizabeth A. Preston Deavers*___
                                                          ELIZABETH A. PRESTON DEAVERS
                                                          UNITED STATES MAGISTRATE JUDGE